UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAMPUS MILLS, LLC & THE BYRAM CONDOMINIUM,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>TOWN OF NORTH CASTLE, et al,<br><br>                              Defendants. | 25-CV-1582 (JGLC)<br><br>**<u>OPINION AND ORDER</u>** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Wampus Mills, LLC ("Wampus Mills") and the Byram Condominium

("Byram") bring this suit against Defendants Town of North Castle (the "Town" or "North

Castle"), Letitia James, in her capacity as the Attorney General of the State of New York, and

Kenneth Jenkins, in his capacity as County Executive of the County of Westchester. Plaintiffs

challenge North Castle's Affirmatively Furthering Fair Housing program ("AFFH Program"),

Town Code § 355-24(i), as an unconstitutional taking in violation of the Fifth and Fourteenth

Amendments of the Constitution of the United States and Article One, Section 7(a) of the New

York State Constitution. Plaintiffs also challenge the Town's actual and threatened revocations of

certificates of occupancy as violating Plaintiffs' due process rights. For the reasons stated herein,

the Court dismisses Plaintiffs' claims.

**BACKGROUND**

**I.       Facts**

The following facts are, unless otherwise noted, taken from the Corrected Amended

Complaint and presumed to be true for the purposes of this motion. *See LaFaro v. N.Y.*

*Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

Plaintiff Wampus Mills is the owner of a property located at 585 Main Street, Armonk, New York ("the Property"). ECF No. 40 ("Am. Compl.") ¶ 7. Wampus Mills developed and sponsors Byram, which is a 55+, sixteen-unit condominium development, constructed upon the Property. *Id.* ¶¶ 8–9, 11, 18.

North Castle, a town in Westchester County, adopted the AFFH Program, which requires developers like Wampus Mills to set aside certain units within new developments as affordable units. For Bryam, Wampus Mills was required to set aside two out of its sixteen units as affordable AFFH units (the "AFFH Units"), and Wampus Mills was required to comply with certain size and sales/rent restrictions related to those units. *Id.* ¶¶ 21, 23. These restrictions were in place before Plaintiffs' construction of Wampus Mills. Town Code § 355-24. *See* Am. Compl. ¶¶ 22, 26. For the first restriction, Town Code § 355-24(i)(6) requires the AFFH Units to be 80% of the average floor space of all the units. Am. Compl. ¶¶ 19–22. Specifically, "because the sixteen (16) condominium units constructed were between eighteen hundred (1,800) square feet to over twenty-one hundred (2,100) square feet, each of the [AFFH Units] was required to be sixteen hundred (1,600) square feet, representing eighty percent (80%) of the average floor area of the market rate units." *Id.* ¶ 21.

Next, Town Code § 355-24(i)(2) caps the maximum monthly rent and maximum gross sales price for the AFFH Units. *Id.* ¶ 23. These rent and sales price limits are based on guidelines issued by the U.S. Department of Housing and Urban Development. *Id.* ¶ 23. The Town Code requires that the AFFH Units remain affordable for a minimum period of fifty years. *Id.* ¶¶ 24–25. Under this regulation, the maximum sales price for each AFFH Unit is $180,000. *Id.* ¶ 81. However, Plaintiffs allege that the fair market value of each AFFH Unit is $1,200,000. *Id.* ¶ 82. Similarly, Plaintiffs allege that if rented according to Town Code, "the total loss in rent for the

statutory period of a minimum of fifty (50) years, discounted at the appropriate rate would approximate [$2,500,000]." *Id.* ¶ 84.

Plaintiffs allege that North Castle caused them to incur millions of dollars of debt during the construction of Byram because of lengthy delays and other requirements. *Id.* ¶ 26, 69–70. In particular, Plaintiffs allege that they submitted Byram's building plans in early January 2018, but North Castle did not complete review of the plans until July 19, 2019. *Id.* ¶¶ 28–34. According to Plaintiffs, this delay meant that Byram's construction extended into the COVID-19 pandemic, when "the workforce became increasingly depleted and the costs of goods, when available, had doubled or tripled in price." *Id.* ¶¶ 46–50.

Further, in the winter or spring of 2023, North Castle's building inspector again delayed Byram's construction by stating that the garage ceiling was not in compliance with the fire code. *Id.* ¶ 52. However, after a months-long dispute, evaluation by an outside firm confirmed that the ceiling did conform to the fire code. *Id.* ¶¶ 53–55. Plaintiffs contend that even amid these delays, Byram's construction still benefitted North Castle in numerous ways, including improvements to the Town's sewer system, achievement of North Castle's stated goal to provide senior housing, and the payment of significant taxes, permits, and fees. *Id.* ¶¶ 35–44.

Plaintiffs allege that these construction delays forced them to seek repeated extensions of their construction loan maturity date from their lending bank. *Id.* ¶ 56. And, in or about May or June 2023, Wampus Mills' lending bank failed to extend the outstanding loan and sold the loan in default to a predatory lender that charged a 24% per annum interest rate. *Id.* ¶¶ 57–58.

On July 12, 2023, because of the mounting debt, Wampus Mill petitioned the Town Board to permit it to relocate Byram's two planned AFFH Units to another available and appropriate location closer to town. *Id.* ¶¶ 69–70. Plaintiffs needed to sell the planned AFFH

Units in Byram at market rate to attempt to lessen a projected $2 million loss Plaintiffs suffered because of construction delays and unanticipated costs. *See id.* ¶¶ 68, 70. The Town Board denied the request because, according to Plaintiffs, the Town "falsely asserted that Wampus Mills' application was motivated by a desire to simply make additionally monies on" Byram. *Id.* ¶ 71.

In or about September 2023, the predatory lender filed for foreclosure of Byram, which required Wampus Mills to void all pending contracts for sale of the condominium units, and take all the units off the market. *Id.* ¶¶ 59–61. By January 5, 2024, Wampus Mills negotiated a forbearance agreement with the lender. *Id.* ¶¶ 62–63.

On November 13, 2024, the owners of the fourteen occupied condominium units in Byram separately petitioned the Town Board to relocate the AFFH Units. *Id.* ¶ 72. The Town Board also denied this request, stating that Wampus Mills was "trying to game the system" and "just trying to make more money." *Id.* ¶ 73. The Town Board stated it would convene a "working session," which Plaintiffs allege never materialized. *Id.* ¶ 74.

On December 17, 2024, the Town's building inspector revoked the Certificates of Occupancy for the AFFH Units, Apartments 1G and 2G, due to Plaintiffs' "failure to submit documentation confirming that all the AFFH units are available for sale or rental." *Id.* ¶ 77. The building inspector also warned that if Wampus Mills did not comply by May 17, 2025, the "Town will be compelled to revoke the Certificate of Occupancy for the entire building." *Id.* ¶ 78. The building inspector advised Wampus Mills that based on the income limits outlined by the AFFH guidelines, the maximum sales price for each AFFH Unit was $180,000. *Id.* ¶¶ 81–84. In contrast, Plaintiffs contend that each AFFH Unit has a fair market value of approximately $1,200,000. *Id.* ¶ 82. Plaintiffs allege that the Town did not afford them a right to be heard,

4

confront any witnesses, or establish a defense, to the actions of the Town's building inspector. *Id.* ¶ 79.

## II.    Procedural History

On February 25, 2025, Plaintiffs initiated this suit against North Castle. ECF No. 1. On May 8, 2025, Plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction enjoining North Castle from revoking or modifying the certificates of occupancy issued in connection with Byram. ECF No. 19. On May 21, 2025, the Court issued a stipulation and order resolving the emergency motion by temporarily enjoining North Castle "from modifying and/or revoking the certificates of occupancy" for the fourteen non-AFFH condominium units and common areas of Byram "on the ground that Plaintiffs have failed to comply with their obligation to affirmatively further fair housing." ECF No. 26.

On May 30, 2025, Defendant North Castle filed its motion to dismiss. ECF No. 28. However, on June 12, 2025, Plaintiffs filed an amended complaint, naming Letitia James, in her capacity as Attorney General of the State of New York, and Kenneth Jenkins, in his capacity as the County Executive of the County of Westchester, as Defendants. ECF No. 36. Plaintiffs named Defendant James in this suit solely in her official capacity, because her office approved the Condominium Offering Plan for Byram. Am. Compl. ¶¶ 14–15. Similarly, Plaintiffs named Defendant Jenkins in this suit solely in his official capacity, because the County of Westchester is "named as the oblige under a certain restrictive covenant regarding the sale or rental of the units of [Byram] which may be affected by the issues presented in this action." *Id.* ¶¶ 16–17. On June 23, 2025, Plaintiffs filed the operative Corrected Amended Complaint to correct the misidentification of Defendant Kenneth Jenkins. Am. Compl.

Plaintiffs allege that the Town's actions constitute an unlawful taking of property in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article One, Section 7(a) of the New York State Constitution. *Id.* ¶¶ 85–92. Plaintiffs also allege that the Town's revocation of the certificates of occupancy for the AFFH Units and its threat to revoke Byrams' building certificate of occupancy violates Plaintiffs' due process rights under the Fifth and Fourteenth Amendment of the United States Constitution. *Id.* ¶¶ 93–95. Plaintiffs seek declarative and injunctive relief, as well as costs and disbursements. *Id*. at 12–13.

On July 14, 2025, Defendant North Castle moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). ECF No. 45. Defendants James and Jenkins subsequently filed motions to dismiss. ECF Nos. 60, 64. On November 6, 2025, Plaintiffs filed their opposition to Defendant North Castle's motion to dismiss, without opposing the motions filed by Defendants Jenkins or James. ECF No. 67. That same day, Defendant North Castle filed a memorandum of law regarding the interests of Defendants Jenkins and James in this action. ECF No. 68. Defendant North Castle asserts that Defendants Jenkins and James are necessary parties under Federal Rules Of Civil Procedure 19(a)(1)(A) and (a)(1)(B)(i). *Id.* at 2.

On November 25, 2025, Defendant North Castle replied to Plaintiffs' opposition. ECF No. 69. On that same day, Defendant Jenkins and Defendant James filed separate letters, both requesting that the Court grant their motions to dismiss as unopposed. ECF Nos. 70–71.

## LEGAL STANDARD

### I.    Motion to Dismiss for Lack of Standing

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When the Rule 12(b)(1) motion is facial, *i.e.*,

6

based solely on the allegations of the complaint . . . the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "Because standing is challenged on the basis of the pleadings, we accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (internal citation and quotation marks omitted). "The task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter*, 822 F.3d at 56 (cleaned up).

## II.      Motion to Dismiss for Failure to State a Claim

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id.* at 679.

**DISCUSSION**

First, the Court determines that Wampus Mills has standing to bring its claims. Next, the Court considers whether Wampus Mills stated a claim for relief. The Court determines that Wampus Mills fails to allege that the AFFH Program is an unconstitutional taking under the United States or New York constitutions. Then, the Court concludes that Wampus Mills fails to allege violations of their due process rights. Because the Court dismisses Wampus Mills' takings and due process claims, it need not and does not address whether Defendants James and Jenkins are necessary parties to this action.

## I.    Wampus Mills Has Standing to Bring Facial Claims

The Court first construes Plaintiffs' Complaint as asserting both facial and as-applied challenges to North Castle's AFFH Program. However, the Court dismisses any as-applied claims as unripe for determination. Next, the Court determines that Wampus Mills has standing to bring its facial claims.

### a.    The Court Dismisses Any As-Applied Claims and Analyzes Plaintiffs' Takings and Due Process Claims as Bringing Facial Challenges

Plaintiffs claim that they are only bringing a facial challenge to the AFFH Program and do not assert any as-applied challenges. ECF No. 67 at 17–18 ("The Town's finality argument fails because this is a facial challenge, not an as-applied challenge."). This position, however, is belied by the Amended Complaint, in which Plaintiffs allege that the present action is to declare North Castle's AFFH Program "as it was and continues to be applied to plaintiffs an unconstitutional taking." Am. Compl. ¶ 1; *see also* Am. Compl. ¶¶ 88, 92 (emphasis added) (stating that North Castle's actions "violate *plaintiffs'* constitutional rights" under the New York State Constitution and the Fifth and Fourteenth Amendments of the United States Constitution). Additionally, Plaintiffs appear to continue to bring as-applied substantive and procedural due

process claims arising from North Castle's actual and threatened revocations of certificates of occupancies for the AFFH Units and Byram. ECF No. 67 at 20–22. The Complaint also, at least arguably, includes allegations indicating facial challenges to the AFFH Program. *See* Am. Compl. ¶¶ 85–95.

Any as-applied challenge to the AFFH Program, however, is unripe. As Defendant North Castle argues, Plaintiffs' as-applied claims are unripe, because Plaintiffs failed to exhaust their available administrative remedies with regard to any of the Town's actions. ECF No. 46 at 16. Specifically, Plaintiffs "never applied for amended site plan approval," appealed the Town's planning board's or building inspector's decisions to the Zoning Board of Appeals, nor "made an application for a use variance for the two AFFH [U]nits." *Id.*

In the land use context, when challenging a decision of a municipality, a prerequisite to bringing suit is that the municipality has "reached a final decision regarding the application of the regulations to the property at issue." *Village Green at Sayville, LLC v. Town of Islip,* 43 F.4th 287, 294 (2d Cir. 2022). This finality requirement applies to regulatory takings claims and due process claims "arising from the same nucleus of facts as a takings claim." *835 Hinesburg Rd., LLC v. City of S. Burlington*, No. 23-218, 2023 WL 7383146, at *3 (2d Cir. Nov. 8, 2023) (quoting *Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 515–16 (2d Cir. 2014)); *see also Kurtz v. Verizon N.Y., Inc.*, 758 F.3d 506, 516 (2d Cir. 2014), *abrogated on other grounds by Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 185 (2019) (establishing that the finality requirement "applies to all procedural due process claims arising from the same circumstances as a taking claim"). The Second Circuit has explained that "the need for finality is especially pronounced" in the land use context, "in order to avoid courts' premature involvement in

9

essentially local disputes." *835 Hinesburg Rd., LLC*, 2023 WL 7383146, at *2 (internal quotation marks omitted).

There are exceptions to the final decision requirement, including futility or when the locality has made clear all such applications will be denied. *Id.*; *see also Kittay v. Giuliani*, 112 F. Supp. 2d 342, 348–49 (S.D.N.Y. 2000), *aff'd*, 252 F.3d 645 (2d Cir. 2001) ("[U]ntil the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question, e.g., that no variances or permits will be granted, a takings claim is premature." (internal quotation marks omitted)). However, Plaintiffs do not raise these exceptions or even contest the Town's argument that no final decision has been made as to their request. *See* ECF No. 67. Therefore, to the extent Plaintiffs brought as-applied takings or due process claims, the Court dismisses them as unripe.

### b.  Wampus Mills Has Standing to Bring its Facial Challenges

Although any as-applied challenges are unripe, Wampus Mills does have standing to bring its facial challenges. The Constitution limits federal courts to hearing certain "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has explained that "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citation and quotation marks omitted). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck– Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

To establish standing, "[a] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (internal citation omitted). The plaintiff bears the burden of establishing these elements. *Id.*

First, "[t]o establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted). Regarding imminence, the threatened injury must be "certainly impending"; allegations of possible future injury are insufficient. *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Second, a plaintiff "satisfies the causation requirement if the complaint avers the existence of an intermediate link between the . . . challenged regulations and the injury." *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (citation modified). However, to allege causation, "a plaintiff need not claim that a defendant's challenged actions were the very last step in a chain of events leading to an injury." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 590 (S.D.N.Y. 2013), *aff'd*, 945 F.3d 83 (2d Cir. 2019).

Third, "[w]hether an injury is redressable depends on the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 660 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)); *see also Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the [defendant] and likely to be redressed by an injunction against them.").

11

Here, North Castle argues that Plaintiffs have no standing or capacity to assert their claims. ECF No. 46 at 11–18. Specifically, North Castle contends that: (1) Wampus Mills lacks a property interest unencumbered by the AFFH Program; (2) North Castle's denial of Plaintiff's relocation petition did not cause the alleged damages; and (3) this Court lacks jurisdiction to grant Plaintiffs' requested relief of permitting Plaintiffs to sell the AFFH Units at fair market rates. *Id.* at 12–14, 18. North Castle emphasizes that Plaintiffs "never challenged the [Town Code] or the AFFH requirement." *Id.* at 12.[1]

Plaintiffs disagree, arguing that their taking claim facially challenges North Castle's AFFH Program and even if the property interest was encumbered with the requirements of the AFFH Program, Plaintiffs still "suffered a concrete economic injury from the government-imposed obligations." ECF No. 67 at 14–15. Additionally, Plaintiffs clarify that their requested relief is not the Court's approval of a relocation petition, but rather for the Court to strike the AFFH Program as unconstitutional. ECF No. 67 at 19. In its reply, North Castle abandons its previous standing arguments regarding Wampus Mills, and argues that Wampus Mills has no standing to sue solely because Plaintiffs' argument that the AFFH Program has frustrated their investment-backed expectations was not raised in the complaint and is "entirely unbelievable." ECF No. 69 at 5.

North Castle's arguments against standing fail. First, Plaintiff alleges actual, concrete, and particularized injury in fact, because their "intended use of the [AFFH Units] is allegedly prohibited by the challenged" regulations. *Congregation Rabbinical Coll. of Tartikov, Inc.,* 915 F.

---

[1] North Castle also challenges Byram's standing, contending that only a condominium board of managers can commence suit on behalf of the condominium. Plaintiffs appear to largely concede this point, requesting leave to amend to substitute Byram for its board. ECF No. 67 at 17 n.7. Because the Court concludes that any claims the board would have necessarily fail on their merits for the same reasons stated below, this Section only addresses Wampus Mills' standing.

Supp. 2d at 591; *see also M.J. Ent. Enters., Inc. v. City of Mount Vernon, New York*, 234 F. Supp. 2d 306, 310 (S.D.N.Y. 2002) (determining that a plaintiff had standing to challenge the constitutionality of a zoning law limiting adult entertainment, because the plaintiff's inability "to offer topless dancing as entertainment at its business establishment" constituted an injury in fact). The fact that Plaintiff obtained its property interest after enactment of the AFFH Program does not change this result. *Congregation Rabbinical Coll. of Tartikov, Inc.*, 915 F. Supp. 2d at 590–91.(determining that a plaintiff had standing when it facially challenged the application of a pre-existing zoning code).

Second, there is a causal connection between the injury and the AFFH Program. That is, Wampus Mills cannot sell or rent the AFFH Units at its desired prices, because of the AFFH Program's limitation on the maximum gross sales and rental prices for the AFFH Units. Am. Compl. ¶ 23. Third, Wampus Mill's alleged injury is redressable through the requested relief of the Court's invalidation of the AFFH Program. Should the Court invalidate the AFFH Program, Wampus Mills would be able to sell and rent the AFFH Units as desired at the fair market value. Therefore, Wampus Mills has established that it has standing to bring these facial challenges to the AFFH Programs.

## II.    Wampus Mills Fails to Allege a Takings Claim

North Castle next argues that Wampus Mills fails to state a viable takings claim. The Court agrees. In reaching this conclusion, the Court determines that *Penn Central's* regulatory takings analysis—and not the *Nolan/Dolan* unconstitutional exactions framework—governs Wampus Mill's claim. Next, in applying the *Penn Central* factors, Plaintiff's facial challenge fails.

### a. *Penn Central*'s Regulatory Taking Analysis Governs Plaintiff's Takings Claims

The parties dispute which framework governs Wampus Mills' takings claim. Plaintiff asserts that the AFFH Program constitutes an unconstitutional exaction governed by the Supreme Court's *Nollan* and *Dolan* doctrine. ECF No. 67 at 1 (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994)). Conversely, Defendant North Castle argues *Penn Central*'s regulatory takings analysis governs Plaintiff's takings claims. ECF No. 46 at 21 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978)). The Court agrees with North Castle.

The Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment. *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 472 n.1 (2005). To state a takings claim, plaintiffs must show "(1) a property interest (2) that has been taken under color of state law (3) without just compensation." *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, No. 19-CV-11285, 2021 WL 4198332, at *13 (S.D.N.Y. Sept. 14, 2021) (quoting *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 452 (S.D.N.Y. 1998)), *aff'd*, No. 21-2448, 2024 WL 1061142 (2d Cir. Mar. 12, 2024). "The law recognizes two types of takings: physical takings and regulatory takings." *Harper v. Vill. of Hillburn*, No. 25-CV-342 (KMK), 2025 WL 2653673, at *10 (S.D.N.Y. Sept. 16, 2025) (citing *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006)).

In certain circumstances involving physical takings, the *Nollan* and *Dolan* framework applies. These cases involve a condition, which "had the government simply appropriated," rather than imposing it as a condition to a permit, would constitute a "*per se* physical taking" of property (including money). *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 546 (2005); *see also*

14

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 827 (1987) (analyzing the conditioning of a coastal development permit on the "transfer to the public of an easement across [the property owners'] beachfront property"); *Dolan v. City of Tigard*, 512 U.S. 374, 377 (1994) (analyzing the conditioning of a building permit on compliance with a municipal community development code, which required the property owner to deed portions of the property to the city for flood control and traffic improvements). The Supreme Court has emphasized that "[a] predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013).

Courts in the Second Circuit have applied *Nollan* and *Dolan* in cases where property owners have been compelled to convey property or pay fines in order to obtain a government permit or service. *See Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) (invoking *Dolan* when a municipality conditioned water supply service on the plaintiffs deeding fifteen feet of property to the city); *31 Alanson Lane, LLC v. Town of Southampton*, No. 23-CV-8938 (NJC) (LGD), 2026 WL 414716, at *8 (E.D.N.Y. Feb. 15, 2026) (analyzing a takings claim under *Nollan* and *Dolan* when a municipal entity required the payment of a $35,280 fee in exchange for approval of a permit to refurbish existing fixtures at the plaintiffs' marina); *225 Northport, LLC v. Vill. of Northport*, No. 24-CV-2967 (ARR) (ARL), 2025 WL 2782360, at *9 (E.D.N.Y. Sept. 30, 2025) (holding that a property owner stated a takings claim under *Nollan* and *Dolan* when challenging excessive building permitting fees); *Jade Aircraft Sales, Inc. v. City of Bridgeport*, 849 F. Supp. 10, 11 (D. Conn. 1994) (acknowledging that a city "condition[ing] the grant of runway access on [the aircraft servicer] plaintiff's conveyance of its land to" the city was an unconstitutional exaction).

In contrast, *Penn Central* governs regulatory takings. 438 U.S. 104 (1978). "Legislation effects a regulatory taking when it goes too far in restricting a landowner's ability to use his own property." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 553 (2d Cir. 2023) (internal citations and quotation marks omitted) (analyzing a facial challenge to New York City's rent stabilization law under *Penn Central*). The Supreme Court has established that regulations of property owners' "*use* of their land by regulating the relationship between landlord and tenant," including the government "plac[ing] ceilings on the rent the landowner can charge," are not *per se* takings, and are analyzed under the *Penn Central* "essentially ad hoc, factual inquir[y] necessary to determine whether a regulatory taking has occurred." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 528–29 (1992) (internal quotation marks omitted) (affirming that a rent control ordinance did not amount to a *per se* taking). Relatedly, a judge in this District recently analyzed price control legislation as a regulatory taking. *See DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 298 (S.D.N.Y. 2023) (holding that plaintiffs stated a regulatory takings claim when challenging legislation "impos[ing] the burden of permanent price caps" on third-party delivery service platforms under the regulatory taking framework).

In sum,

> [t]he Supreme Court appears to have adopted a useful, easily applied test for identifying a taking. If the exaction involves any transfer of property or money from private parties to the public, it will be analyzed under *Nollan* and *Dolan* standards. On the other hand, where no transfer takes place, even effectively confiscatory use restrictions will be analyzed under the multifactor *Penn Central* test.

Deborah M. Rosenthal, *Nollan, Dolan, and the Legislative Exception*, 66 Plan. & Env't. L. 4 (2014).

Here, *Penn Central* governs North Castle's AFFH Program. *Nollan* and *Dolan* do not apply because the AFFH Program imposes a use restriction on property, rather than a condition

that Plaintiff wholly dedicate or transfer property to the government. "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528 (citing *Nollan*, 483 U.S. at 831–32). This different case, the Supreme Court suggests, may be governed by *Nollan* and *Dolan*. On the other hand, regulations that restrict use or sale prices are governed by *Penn Central.* Although it is true that Wampus Mill will profit less under the AFFH Program than if it were able to sell or rent the AFFH Units at fair market price, the AFFH Program does not require any direct transfer of property or money to the government or public. The AFFH Program, like other regulations that require property owner's compliance, may diminish the property's value or require the property owner to endure costs, but those costs and reductions in profit do not necessarily constitute exactions. *See Penn Cent.*, 438 U.S. at 124 (establishing the regulatory takings framework to analyze a challenge to a municipality's refusal to approve plans for construction of an office building over a designated landmark building); *Cienega Gardens v. United States*, 331 F.3d 1319, 1338–40 (Fed. Cir. 2003) (remanding to the district court to undertake a *Penn Central* analysis of regulations that required property owners to sell or lease exclusively to housing program participants and that restricted those participants from prepaying their mortgages); *see also Exaction*, *Black's Law Dictionary* (12th ed. 2024) (defining "land-use exaction" as "[a] requirement imposed by a local government that a developer dedicate real property for a public facility or pay a fee to mitigate the impacts of the project, as a condition of receiving a discretionary land-use approval").

Plaintiff cites no authority applying *Nollan* and *Dolan* to an affirmative housing or rent control law like the AFFH Program. Neither of the two cases Plaintiff cites in support of its argument for applying *Nollan* and *Dolan* are persuasive. *See* ECF No. 67 at 8–9 (citing *Coal. for*

*Fairness in Soho & Noho, Inc. v. City of New York*, 221 N.Y.S.3d 89, 90, 434 (1st Dep't 2024) *reversed by* No. 112, 2026 WL 88133, at *1 (Jan. 13, 2026); *Builders Ass'n of Metro. Pittsburgh v. City of Pittsburgh*, No. 22-CV-706 (RJC), 2023 WL 2758931 (W.D. Pa. Apr. 3, 2023)). First, in *Coalition for Fairness*, New York's First Department applied *Nollan* and *Dolan* to a law conditioning a permit on payment of a fee to the municipality's fund. 221 N.Y.S.3d at 90. This is distinguishable from here, because the permit condition required a direct transfer of money to the government. *Id.* Second, in *Builders Ass'n of Metro. Pittsburgh*, the Western District of Pennsylvania did not undergo a Takings Clause analysis. 2023 WL 2758931 at *2. These cases do not support the application of *Nolan/Dolan* here. Therefore, the Court concludes that *Penn Central* governs the takings analysis for the AFFH Program.

### b. The AFFH Program Does Not Constitute a Regulatory Taking under *Penn Central*

*Penn Central* "instructs courts to engage in a flexible, 'ad hoc, factual inquir[y]' focused on 'several factors that have particular significance.'" *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 553 (2d Cir. 2023) (quoting *Penn Cent.*, 438 U.S. at 124). These factors include (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124. New York state courts apply the federal *Penn Central* standard to takings claims under the New York state constitution. *Soon Duck Kim v. City of New York*, 613 N.Y.S.2d 31, 32 (2nd Dep't 1994), *aff'd sub nom. Kim v. City of New York*, 90 N.Y.2d 1  (1997). "[A] facial challenge is the 'most difficult challenge to mount successfully,' because the challengers 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" *Harper v. Vill. of Hillburn*, No. 25-CV-342 (KMK),

2025 WL 2653673, at *10 (S.D.N.Y. Sept. 16, 2025) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

This is a "high bar"—particularly, for facial challenges to regulations of "housing conditions in general and the landlord-tenant relationship." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) (upholding an emergency statute that instituted a mortgage moratorium and extended the time period in which mortgagors could repay their debts)); *see also Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (noting that the plaintiff landlords had been "unable to identify a case where a facial challenge to rent-control-related legislation had succeeded"); *W. 95 Hous. Corp. v. N.Y.C. Dept. of Hous. Pres. and Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (rejecting a facial Takings Clause claim against a rent stabilization law, because the difficulty of assessment of its purposes and economic effects "suggests that a widely applicable rent control regulation . . . is not susceptible to facial constitutional analysis under the Takings Clause").

Here, Plaintiff does not meet the high bar of sufficiently alleging a facial challenge to the AFFH Program. Plaintiff failed to allege that the AFFH Program was unconstitutional in all of its applications, as required by *Penn Central*. Regarding the first two *Penn Central* factors, Plaintiff does not allege that "every owner of a[n AFFH] property has suffered an adverse economic impact," or that the AFFH Program "interferes with *every* property owner's investment-backed expectations." *Cmty. Hous. Improvement Program*, 59 F.4th at 554; *see also Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, No. 21-2448, 2024 WL 1061142, at *3 (2d Cir. Mar. 12, 2024), *cert. denied sub nom. G-Max Mgmt., Inc. v. New York*, 145 S. Ct. 561 (2024), *and cert. denied*, 145 S. Ct. 563 (2024) (holding that plaintiffs-appellants' "facial

19

regulatory taking claims [challenging rent stabilization laws] must fall" when appellants failed to

show "that, for all affected property holders, the economic impacts are universally negative and

that investment-backed expectations were subverted"). Additionally, "[t]he caselaw uniformly

rejects the proposition that diminution of property value is grounds for a regulatory taking." *ABN

51st St. Partners v. City of New York*, 724 F. Supp. 1142, 1155 (S.D.N.Y. 1989) (internal

quotation marks omitted).

The second *Penn Central* factor, the extent to which the AFFH Program has interfered

with distinct investment-backed expectations, particularly weighs against Plaintiff. "The

reasonableness of owners' expectations ensures that compensation is limited to those owners

who can demonstrate that they bought their property in reliance on a state of affairs that did not

include the challenged regulatory regime." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 567 (2d

Cir. 2023). Here, Plaintiff voluntarily initiated the Byram project in 2018 with knowledge of and

intent to comply with the AFFH Program. Am. Compl. ¶¶ 22, 26; ECF No. 46 at 1 ("In 2014, the

Town of North Castle adopted a local law requiring that no less than 10 percent of the units in

residential developments with 10 or more units be made available as affordable AFFH units and

remain so for not less than 50 years."). There are no allegations that Plaintiff "bought their

property in reliance on a state of affairs that did not include the challenged regulatory regime."

*Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal citation omitted). Therefore, the

AFFH Program could not have interfered with reasonable investment-backed expectations,

because, in this case alone, the AFFH Program predates Byram's construction.

Additionally, the third factor, the character of the AFFH Program, also weighs against the

AFFH Program constituting a regulatory taking. "The Supreme Court has instructed that in

analyzing the 'character' of the governmental action, courts should focus on the extent to which

a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'" *74 Pinehurst LLC*, 59 F.4th at 568 (quoting *Penn Cent.*, 438 U.S. at 124). Here, Plaintiff fails to allege any facts about the character of North Castle's regulatory actions, or rebut North Castle's assertion that the AFFH Program "serve[s] the public good by ensuring the adequate supply of affordable housing." ECF No. 46 at 22. In fact, Plaintiff concedes in its opposition that under *Penn Central*, "providing affordable housing is a perhaps laudable goal of the government." ECF No. 67 at 10.

Therefore, after consideration of the *Penn Central* factors, the Court concludes that Plaintiff's facial challenge to the AFFH Program fails.

### III.   Wampus Mills Fails to Allege a Substantive Due Process Claim

Plaintiff's substantive due process claim also fails because it is improperly duplicative of Plaintiff's takings claims.

> [T]he Due Process Clause cannot do the work of the Takings Clause because where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

*74 Pinehurst LLC v. New York*, 59 F.4th 557, 569 (2d Cir. 2023) (internal citations and quotation marks omitted); *see also Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, No. 21-2448-CV, 2024 WL 1061142, at *5 (2d Cir. Mar. 12, 2024), *cert. denied sub nom. G-Max Mgmt., Inc. v. New York*, 145 S. Ct. 561 (2024), and *cert. denied*, 145 S. Ct. 563 (2024) (affirming dismissal of due process, when plaintiffs-appellants "allege no factual differences in their due process and Takings Clause claims").

Here, Plaintiff's substantive due process claim duplicates their takings claim in facially challenging the AFFH Program. Plaintiff alleges no facts specific to their substantive due process

21

claim, which like their takings claims arise from North Castle's implementation of the AFFH Program, revocation of the certificates of occupancy for the AFFH Units, and threat to revoke the certificate of occupancy for Byram entirely. Am. Compl. ¶¶ 93–95; ECF No. 67 at 21 ("Here, where the Town has revoked the certificates of occupancies for the AFFH Units and threatened to do so for the entire building, Plaintiff[s have] properly stated a claim for a violation of their substantive due process, in addition to a taking."). The Court, therefore, dismisses Wampus Mills' substantive due process claim.

### IV.    The Court Denies Leave to Amend

The Court denies Wampus Mills leave to amend its complaint. Plaintiffs request leave to amend their pleadings only for the purpose of substituting the Board of Managers of the Byram Condominium for Byram. ECF No. 67 at 17 n.7. Because any claims brought by its board would necessarily fail on their merits for the same reasons stated above, the Court denies Plaintiffs' request for leave.

The Court also *sua sponte* denies Plaintiffs' leave to amend the merits of their pleading.

> Leave to amend, though liberally granted, may properly be denied for: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."

*Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, amendment would be futile. Plaintiffs have identified no facts that would change the Court's outcome here. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (stating that requests to replead should be denied when "[t]he problem with [the pleading] is substantive" and "better pleading will not cure it"). Additionally, Plaintiffs have already filed an amended complaint in this matter. ECF No. 36; *see also Ruotolo*, 514 F.3d at 191 (affirming

22

denial of leave to amend "given the previous opportunities to amend"). Therefore, the Court denies Wampus Mills leave to amend.

## CONCLUSION

In sum, the Court dismisses Plaintiffs' facial Takings Clause and due process claims with prejudice. The Court dismisses Plaintiffs' as-applied claims without prejudice as unripe. The Court GRANTS Defendant North Castle's Motion to Dismiss Plaintiffs' Amended Complaint in its entirety. The Clerk of Court is directed to terminate ECF Nos. 28, 45, 60, and 64, and close this case.

Dated:  March 26, 2026
        White Plains, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge

23